# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40410**

————————————

**UNITED STATES**
*Appellee*

v.

**Erik C. WILLIAMS**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 31 July 2024

————————————

*Military Judge*: Charles G. Warren.

*Sentence*: Sentence adjudged on 20 May 2022 by GCM convened at Whiteman Air Force Base, Missouri. Sentence entered by military judge on 27 July 2022: Dishonorable discharge and reduction to E-4.

*For Appellant*: Major Matthew L. Blyth.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, GRUEN, and KEARLEY, *Appellate Military Judges*.

Judge GRUEN delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge KEARLEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

GRUEN, Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault, in

violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] Consistent with his pleas, the members acquitted Appellant of one specification of sexual assault in violation of Article 120, UCMJ.[2] Appellant was sentenced to a dishonorable discharge and reduction to the grade of E-4. The convening authority took no action on findings and approved the sentence in its entirety.

Appellant raises seven assignments of error on appeal which we have reordered and reworded: (1) whether Appellant's conviction is legally sufficient, (2) whether Appellant's conviction is factually sufficient; (3) whether circuit trial counsel committed prosecutorial misconduct; (4) whether the military judge abused his discretion when he denied an implied bias challenge against a member who was an outcry witness for a close friend who was an alleged sexual assault victim in a separate trial; (5) whether Appellant was denied his constitutional right to a unanimous verdict; (6) whether Appellant is entitled to relief for "excess confinement credit;" and (7) whether, as applied to Appellant, 18 U.S.C. § 922 is constitutional.[3]

We find the evidence in the record does not support factual sufficiency and set aside the sole charge and specification of conviction. We decline to address the remaining issues.

## I. BACKGROUND

Appellant joined the Air National Guard in December 2011. By the time of his court-martial, Appellant had served more than ten years and deployed twice—to Qatar in 2015 and Kuwait in 2018. The conduct underlying Appellant's conviction allegedly occurred in Italy at NASSIG during Appellant's redeployment from Kuwait.

In February 2018, Appellant deployed as part of a unit from Missouri of approximately 100 members for a four-month tour, including the alleged victim, TC, who was a staff sergeant at the time and married with three children. The unit began their redeployment flight to the United States on 1 July 2018.

---

[1] References to the punitive articles are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*). All other references to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial*, *United States* (2019 ed.) (2019 *MCM*).

[2] The specification for which Appellant was convicted alleged vaginal penetration and the specification for which Appellant was acquitted alleged anal penetration.

[3] Appellant personally raises Issues 6 and 7 pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

That same day, they stopped for crew rest in Italy at Naval Air Station Sigonella (NASSIG). TC was the only female on this flight.

## A. TC's Version of Events

On 1 July 2018, the unit arrived in Italy around 0800 hours local time.[4] TC checked in to her room at approximately 0843 hours. She "relaxed a little bit[,] showered[,] and called [her] husband and [her] father." She then left her room to meet two of her flight mates, Staff Sergeant (SSgt) KW and SSgt TS. SSgt KW and TC had been friends for 10 to 11 years and knew each other's families back home. They had gone shopping and attended children's birthday parties together.

Around "noon to 1 o'clock," TC, SSgt KW, and SSgt TS went to a restaurant on station for lunch. TC had a slice of pizza (the first thing she had eaten since before she left Kuwait) and iced tea. She had not consumed any alcohol at this point in the day. Their plan for the rest of the day was "to drink beer." They first went to the base exchange (BX) where TC took out cash from an automated teller machine (ATM) to purchase a warm 30-pack of beer, and then they went back to SSgt KW's room to put some of the beer in the freezer to chill. They took the rest of the beer to an outside shelter at lodging and sat at a picnic table to drink.

According to TC, there were other members of their unit also hanging out and drinking. TC estimated they stayed at the shelter for approximately two to three hours while she drank a total of five to six beers and felt a little buzzed. The three of them took turns going back to SSgt KW's room to get more beer. At some point, another member of their unit, Technical Sergeant (TSgt) GC, sat and drank with them. TSgt GC sat across from TC at the table and she "talked to him quite a bit." TC remembered his face from home station, but she never knew his name. TC, SSgt KW, SSgt TS, and TSgt GC decided that later they would meet again for dinner and go to a strip club. TC testified that this was "a very typical thing" for her "to do with the guys."

TC then went back to her room where she changed clothes, freshened up, and ate "a couple [of] bars out of [her] backpack." She rejoined the same unit members at approximately 1730 hours. She claimed she felt fine by 1730 as the buzz from the beers she drank earlier had "went away." The group could

---

[4] Approximate times are derived from a log of hotel room keycard entries. While approximate times can be ascertained, exact times cannot. Special Agent JS of the Air Force Office of Special Investigations testified at Appellant's court-martial that the keycard entry logs were determined to be inaccurate by approximately 30 minutes.

not get a taxi to take them off station so they changed their plans and decided they would "do it up in Ireland" by going to dinner and a strip club there, as Ireland was the next stop on their trip home. Instead, while still in Italy, they went to the pub, which was next to the restaurant where they had lunch earlier, a short walk from lodging.

Because the pub did not serve food, the four of them went to the restaurant next door. TC did not care for the food choices so she walked back to the pub without ordering anything. When TC arrived there, she saw some other members of her unit—SSgt BO, Master Sergeant (MSgt) JD, SSgt CS, and Appellant—and went to sit with them. Shortly thereafter, SSgt KW, SSgt TS, and TSgt GC arrived at the pub with their food. SSgt KW informed TC that he and SSgt TS wanted to go back to their rooms, so they took their food and left.

TC ordered a beer when she first sat down at the pub with her unit members, but did not drink it because "it didn't taste good." She later ordered an alcoholic drink known as "Long Island Iced Tea" that she drank in full. She ordered a second Long Island Iced Tea and "the last [she] remember[ed] . . . maybe a quarter of it was gone." TC stated, while in Kuwait, she had promised TSgt GC she would buy him a birthday drink. She decided to buy the birthday drink that night, but "[could not] remember if it was a shot or if it was an actual drink, [or] if [they] got the same things or different things[.]"

TC testified she did not remember leaving the pub or "going somewhere" else from there. According to her, the last thing she remembered from the pub was "looking at [her] glass to see if [she] needed a refill." She did not remember any romantic contact with Appellant.

According to TC, the next thing she remembered was later "waking up" while it was dark outside "lying down" on a "tennis court" near a "chain link fence." At the time TC awoke, she was wearing the same clothes she wore out to the pub the night before and she was not disheveled.[5] She soon realized, however, that she did not have her shoes, cellphone, purse, or keycard for her room. At this point, TC did not suspect she had been sexually assaulted. Rather, TC testified, "I was very concerned with the fact that I was left and no one made sure that I got home. . . . [T]hat was my biggest worry at the time."

TC began walking and the Naval Security Forces from the base (police) stopped her. TC recalled she "[cried] a lot . . . because they asked her a lot of

---

[5] She testified upon cross-examination that when she awoke, her clothes were on, her pants were not undone, her bra and shirt were on the way they were supposed to be, and that to her, everything about her clothing seemed completely normal.

questions," such as "who [she] was, [and] where [she] was from." She did not know what to tell them because she did not recall at that time if there was more than one lodging facility on base. They asked her if she had been sexually assaulted and she said she had not. TC did not know how the police "found out where [she] was staying . . . but they did." The police then escorted her back to lodging. Having been contacted by the police, TC's troop commander, MSgt BT, was waiting for her when she arrived. TC testified that when she encountered MSgt BT, she was horribly embarrassed, "humiliated," and "worried about it . . . how it looked."

TC testified that after meeting briefly with MSgt BT, the police took her to her room. She left her room soon thereafter, however, feeling "very anxious, walking around, not knowing what to do with [herself]." TC went down to the lobby. While crying, she inquired with the desk clerk how to use her room phone to call home. TC then returned to her room and called her husband.

According to TC, after talking with her husband for "10 to 15 minutes[,]" she went back to the lobby to ask where the tennis courts were located because she wanted to look for her cellphone and other lost belongings. The desk clerk, Ms. KB, insisted on going with her because it was dark as it was the early morning hours of the next day, 2 July 2018. They walked together to the tennis courts and searched for TC's belongings but did not find them. On the way back to lodging, TC told the desk clerk that she smelled "semen on [her] body[,]" but did not have any other indication that she might have been sexually assaulted. By the time TC returned to her room, she remembered she did not have much time before she was supposed to check out of lodging and get on a bus for a 0700-hour show time.

After returning to her room, TC eventually fell asleep and did not wake up until SSgt TS knocked on her door and informed her, "[W]e got to go, everybody is on the bus[.]" He asked her, "[D]o you need help?" At that time, SSgt TS packed her bag while she went to the bathroom to change into her uniform. There she noticed "scratches on [her] legs[,]" some "rug burns on [her] knees," and that her underwear was "missing." She testified she had no memory of how she received the scratches and rug burns nor how her underwear was removed or where her underwear was at the time.

TC checked out of lodging sometime after 0700 hours. The evidence indicates that she received her purse from police sometime after 0300 during the time they were ensuring she was safely back in her room. However, TC testified she received her purse back with her room keycard inside her wallet and she "believe[d] that someone turned it into the hotel lobby[.]" She believed she got her purse back when checking out of lodging. While checking out, the desk

clerk handed her a pamphlet on sexual assault as she was leaving. TC testified this made her "more upset."

TC was the last one to board the bus. She saw everyone "looking" at her and felt "extremely uncomfortable." When the bus arrived at the flight line, SSgt KW, TC's longtime friend, pulled her aside as she got off the bus and asked her, "[W]hat's going on[?]" She testified she told him she "woke up around 3 o'clock in the morning on the tennis court and . . . didn't have [her] phone, shoes, [or] purse." She believed she "told him that [her] underwear w[as] missing, and that [she] saw some scratches on [her] legs." She further stated that SSgt KW became visibly angry and told her to "get on the aircraft, get in [her] seat, and he would be up there in a minute."

At the aircraft, TC observed the unit members from the pub the night before standing under the wing. She saw SSgt KW go over, speak to them, and return with her cellphone. SSgt KW told her Appellant had found the phone in front of his room. TC testified she "started freaking out" and emotionally "lost it." TC then asked SSgt KW, "[W]hat happened last night . . . ?" TC stated Appellant then approached her, squatted a few feet in front of her, and said that he was sorry no one got her home the night before. TC told him she was "sorry that [she had] hung out with people that [she didn't] know." According to TC, Appellant "lingered" in the area for a "couple of minutes" before leaving.

TC fell asleep on the flight to Ireland. Upon awaking, she "could feel that something had happened. [Her] vagina hurt. [Her] anus hurt. And [her] back hurt." According to TC, she thought she might have "possibly been raped." TC did not immediately report this to anyone.

When the plane landed in Ireland, a "welcoming committee" greeted the unit. TC took a beer from "a group of ladies with golf carts" serving them. She boarded a bus to a hotel. Later, when TC got to her hotel room, she used the restroom. She testified, "[I]t was painful to defecate. When I wiped my anus[,] first I saw blood and what I thought might be semen." According to TC, she immediately called SSgt KW while crying and told him, "I think I was raped[.] I need to go to the hospital."

At the hospital, TC talked with a doctor in the emergency room. TC testified she told the doctor what she "knew" and the doctor told her he was going to call the police. According to TC, she was not "a hundred percent sure" she had been "raped." SSgt KW stayed with TC as "various people came in to talk" with her and "somebody" drew her blood. TC talked with an Air Force sexual assault response coordinator (SARC) using SSgt KW's phone. SSgt KW also talked with the SARC.

Later in the evening, a doctor examined TC in the presence of a female police officer. TC told them, "[I]f this happened, I [didn't] know who did it, but . . . assumed it was . . . someone from the Naval Base that we were at in Italy, while I was lying on the tennis court[.]" After being asked by the police if there were any tears in her jeans, she reported no tears or damage of any kind. She also specifically told the doctor that if an assault occurred, it was not TSgt GC who assaulted her. She did not mention Appellant. TC also provided fluid samples during the sexual assault examination.

TC provided mostly a chronological narrative of events during the Government's direct examination. She provided further explanation of certain details on cross-examination by trial defense counsel. In particular, TC testified on cross-examination that if what allegedly occurred in Italy was a consensual sexual event, she would not want her husband to know. TC also stated that she did not notice until a few days later she had "handprint bruises [ ] on each hip" and that she did not know what she was going to tell her husband because she was afraid he might think she consented. TC also denied saying at the pub that TSgt GC was hot and that she would "f[**]k him," although other witnesses as we describe *infra* said she did and that her remarks made them feel uncomfortable.

Although TC recalled many significant details from the night of the alleged sexual assault, there were many other details she could not recall, or testified about inconsistently. While TC reported they arrived at NASSIG "anywhere between 11 and 1'o clock[,]" records show the unit's plane landed and she checked in to lodging a few hours earlier. TC also testified that no other patrons were in the pub except for her group and a girl who came in looking for her cell phone. She did not recall the air crew of officers, pilots, co-pilots, and navigators that other evidence showed were at the pub that night. Similarly, she did not remember being around the pool tables. She did not recall leaving the pub that night.

According to TC, what she did recall from that evening at the pub is going up to the bar to order a drink, then seeing that drink at her table, and going up to the bar again to ask them to change the music. TC remembered going back to sit down at the table where TSgt GC told her that he liked her choice of music. According to TC, she also remembered looking at her glass to see if she needed a refill. While TC conceded she could have drunk more alcohol than she remembered, she only recalled drinking the one and one quarter glasses of Long Island Iced Tea.

On cross-examination, TC provided more details about how she smelled when walking with the lodging staff member. She stated it was a mixture of

semen and vaginal fluids that she smelled on her hands, arms, and in a clear vaginal discharge. Trial defense counsel also confronted TC with the keycard entry logs, which showed her keycard was used to enter her room at approximately 0218 and again at 0234 hours, suggesting she had come and gone from her room at those times. TC had no memory of doing so.

TC also testified on cross-examination that the morning she hurriedly changed to get into her uniform for the flight from Italy to Ireland, she noticed a clear wet spot on her jeans, but no blood. She also denied seeing any blood on her uniform, which she wore on the flight from Italy to Ireland with no underwear. Even though TC maintained in her testimony that she had no memory of anything that happened after leaving the pub, she reported to the doctor in Ireland that she had been penetrated vaginally and anally.

## B. Witness Testimony by Unit Members

Many other witnesses testified at trial, including several who were at the pub with Appellant and TC in the hours leading up to the alleged sexual assault, and those who observed them in transit to Ireland the next day.

In particular, several witnesses testified about their recollection of TC's condition when they drank with her at the picnic area and/or the pub. Much of the specifics of witness testimony was inconsistent with other witness testimony. SSgt KW estimated he observed TC drink about six to eight beers at the picnic area. He did not stay at the pub long enough, however, to testify about how much she drank at that location.[6]

SSgt BO testified that he drank with TC at the pub. According to SSgt BO, TC did not seem "overly intoxicated by any means" when he arrived at the pub. SSgt BO recalled, however, noticing two shots and a beer in front of TC later in the evening and "after a bit of time . . . [he] would glance[ ] back over and the shots were gone. [S]he had been drinking them with beer." He testified he did not actually see TC drink the shots, but assumed she did. SSgt BO further testified that towards the end of the night he observed TC's level of intoxication "appeared to be worse than anyone else there."

SSgt BO testified on cross-examination that by the end of the night he observed both TSgt GC and Appellant as definitely "intoxicated." According to SSgt BO, at some point, he heard TC say she thought TSgt GC "was hot and she would f[**]k him" if they were not married to someone else. SSgt BO testified he found TC's comment inappropriate and went outside to discuss it with

---

[6] SSgt KW further testified to TC's character for truthfulness stating—in his opinion—she is truthful.

MSgt JD. According to SSgt BO, when he and MSgt JD returned to the pub, TC and Appellant were gone.

In MSgt JD's testimony, he confirmed hearing TC's comment about TSgt GC. He testified that when TC made this remark, TC was not "falling down drunk" and was able to carry on a conversation. He further testified that during the evening, TC swayed a little bit and leaned on the bar as one does when a little intoxicated. According to him, by the end of the evening, she was "one of the more intoxicated people in that group." He also observed Appellant was one of the more intoxicated people at the pub.

TSgt GC testified that he was married at the time of the alleged incident in this case. He estimated he was at the pub for approximately four hours. On cross-examination, he acknowledged he was really drunk that night and returned to his room at approximately 2100 hours.

Counsel for both sides did not question TSgt GC about TC's comment that she would have sex with him if they were not married to someone else. TSgt GC did testify, however, that he remembered TC drank that night, but could not recall if she was drinking when he arrived. According to TSgt GC, he drank at least one Long Island Iced Tea in celebration of his birthday, but he did not recall if someone else purchased it for him. He did not remember anyone having shots.

TSgt GC further remembered TC slurring her words and wavering or stumbling at their table later in the evening. According to TSgt GC, just before TC left, TSgt GC informed their aircraft commander that TC seemed inebriated and needed to call it a night. TSgt GC testified he did not remember observing Appellant's level of intoxication but believed Appellant was the one who was "appointed" to escort TC back to her room.

TSgt GC described his own level of drunkenness. He testified that he knew he had one Long Island Iced Tea. While he believed he had more drinks than that, he did not recall what those drinks might have been. He also testified that after leaving the pub he later awoke in his bathroom between the bathtub and the toilet and saw that he had urinated on himself. TSgt GC claimed he had never blacked out from drinking.

Other witnesses provided additional testimony about their observations of Appellant at the pub. In particular, Lieutenant Colonel (Lt Col) JL testified he did not remember any specific person's level of intoxication, but he did concur he told Air Force Office of Special Investigations (OSI) agents closer in time to the events that he and his crew assumed, knowing Appellant, "that he was the most sober/responsible one to get [TC] home[.]" Lt Col JL stated, however, that

he never told Appellant to take her home and did not see Appellant or TC leave the pub that night.

On cross-examination SSgt BO testified that by the end of the night, he observed TSgt GC and Appellant were "definitely intoxicated."

In addition to the various accounts of what happened at the pub, a naval security officer, MA2 RE, testified about finding TC early in the morning of 2 July 2018, after the assault supposedly occurred. Specifically, MA2 RE testified she encountered TC on the right side of the softball fields at NASSIG, near the tennis courts. MA2 RE estimated this location is no more than a five-to-ten-minute walk from lodging.

MA2 RE testified TC had no shoes or purse, she did not appear disheveled, but she did seem upset. MA2 RE recalled TC showing signs of intoxication—slurred speech, glassy eyes, fidgeting—and smelled faintly of alcohol. According to MA2 RE, her section chief and watch commander arrived on scene to assist her and questioned TC. MA2 RE testified she contacted lodging and confirmed TC was staying there and further learned TC's purse and shoes had been returned earlier to the front desk.

Upon returning TC to lodging, they met with TC's troop commander, MSgt BT. MA2 RE explained TC was not in trouble with security forces. MA2 RE remembered security forces checking TC's room to make sure it was clear but did not remember if they used a new keycard from lodging or the keycard in TC's purse. MA2 RE reported TC was in security officers' presence from approximately 0250–0328 hours.

Various other witnesses testified to TC's condition after MA2 RE found her at the softball fields. MSgt BT recalled answering the phone at approximately 0330 hours and learning security forces had one of his unit members in custody. MSgt BT then went to meet with TC and two security officers. According to MSgt BT, he asked TC if she was all right and she responded that she was embarrassed but nothing else was wrong. MSgt BT testified TC appeared to be "fully clothed, [and] not disheveled in any way." According to him, she did not appear to be overly intoxicated, but did appear upset.

Ms. KB, the lodging staff member and desk clerk who walked with TC back to the tennis courts, also testified. According to her, she started her shift at midnight. When she arrived, she was informed a purse had been turned in. Later, sometime between 0230 and 0300 hours, a security officer contacted the staff member inquiring about TC possibly staying at the lodging facility. Ms. KB confirmed TC was staying there.

Ms. KB further testified a security officer later retrieved TC's purse and room keycard. After security forces left, TC went down to the front desk. Ms. KB stated she provided TC with instructions on how to dial out from the phone in her room. TC returned to her room, but came back about 15 to 20 minutes later, which Ms. KB estimated to be "3:30 and maybe 4 or 4:30." TC told Ms. KB she wanted to find the tennis courts to look for her cellphone.

Ms. KB testified she accompanied TC on about a five-minute walk to the tennis courts. Ms. KB suspected something traumatic happened to TC because of her level of emotions. During the walk, TC told Ms. KB she thought something may have happened to her because of the way she felt "down there" and "the way that it smel[led]." Ms. KB testified that TC said, "[I]t smells like d[*]ck down there." According to Ms. KB, TC also told her she woke up on the tennis courts with her pants around her thigh area. Ms. KB testified she and TC searched the tennis courts for TC's cellphone but did not find it.

Ms. KB further testified she asked TC on the walk back to lodging if TC "wanted to be taken to the clinic, to the ER." TC declined. On cross-examination, Ms. KB testified that TC told her that she did not know what happened, she felt stupid, and she would never cheat on her husband. Ms. KB advised TC that if TC did not "remember having sex then there was no consent" and she did not cheat on her husband. According to Ms. KB, she told TC this to calm her down because TC's main concern was about "never [ ] cheat[ing] on [her] husband."

Ms. KB further testified she gave TC a hug when they arrived back at lodging and told TC she would be in the lobby if TC needed anything. Ms. KB recalled that TC's purse was returned to her via security forces around 0315–0330 hours.

Ms. KB next saw TC at approximately 0700–0715 when she checked out of lodging—she was the last person in her unit to check out. Ms. KB noticed that while they were checking out, some of the other unit members gossiped about TC and commented about "the night before." Ms. KB then "slipped a [Sexual Assault Prevention and Response ('SAPR')] pamphlet into [TC's] pocket and told her to call them if she needed anybody."

SSgt TS stated TC's husband called him at approximately 0300 hours. He testified that he told TC's husband she was not doing well. According to SSgt TS, TC's husband asked SSgt TS to check on her. SSgt TS further testified that when he talked with TC she told him she did not remember anything from the night before. She had relayed that she had bruises and scrapes on her legs, but offered without context that she did not know if she was resisting. SSgt TS testified he observed TC was crying and upset.

Witnesses also testified about what happened between the time the unit boarded buses to the plane and the time they reached their next destination, Ireland. Lt Col JL testified he saw TC crying and upset. Similarly, MSgt BT testified TC looked hung over, upset, and was visibly crying.

In particular, several witnesses offered their recollections of interacting with Appellant that morning. Lt Col JL testified he asked Appellant about getting TC home the night before and Appellant responded that he got her to the building, which was his responsibility. According to Lt Col JL, Appellant also said something along the lines of he would not jeopardize his relationship with his girlfriend back home.

SSgt TS testified Appellant told him he and TC had sat out at the picnic area and talked for a while after they left the pub. SSgt TS further stated Appellant told him he was intoxicated and went back to his room to call his girlfriend.

SSgt BO testified to recalling someone in a group at the side of the plane asking Appellant if he took her back to her room. According to SSgt BO, Appellant replied, "I don't know, I just dropped her off and that was it." MSgt JD also testified that Appellant told him he had "just taken her back to lodging."

The witnesses offered conflicting testimony about how TC's cellphone was recovered. SSgt TS claimed he received the phone from Appellant who, according to SSgt TS, claimed he had found it outside his room. MSgt BT testified, however, that Appellant brought TC's cellphone to him. MSgt BT stated he did not remember where Appellant said he found the phone, but he was positive Appellant brought him TC's phone. According to MSgt BT, he handed the phone to SSgt KW "because [TC] had not made it to the bus." MSgt BT testified he also sent SSgt KW to TC's room to get her. SSgt KW, for his part, testified Appellant said he found TC's cellphone around some parked cars.

Another witness, Mr. KJ, testified that he was Appellant's first sergeant in February 2020 when he escorted Appellant to submit a DNA sample and then to a meeting with a counselor.[7] According to Mr. KJ, after they left the

---

[7] On 26 July 2018, Appellant was interviewed as a potential witness along with multiple other members of their redeployment unit. At the time, he was not read his Article 31, UCMJ, 10 U.S.C. § 831, rights and he was not considered a suspect. On 7 February 2020, OSI executed a search warrant to obtain Appellant's DNA to "cross-reference" with the unknown male DNA sample retrieved from TC's sexual assault examination. They based the probable cause for the warrant on the fact that Appellant was "the last one seen with [ ] [TC]."

counselor's office, Appellant spontaneously asked him, "[I]f you were drunk, can [you] commit rape . . . [a]nd could he say he was raped too[,] if [he was] drunk."

## C. Expert Testimony

The evidence at Appellant's court-martial also included forensic and other expert testimony.

### 1. DNA Expert

Ms. MB, an expert in the field of DNA testing who was called to testify for the Government, stated that she reviewed the DNA report in this case and confirmed the samples that were taken and tested from TC's sexual assault exam in Ireland showed Appellant could not be excluded as a DNA donor. She further testified the anal swabs taken during the exam were external samples, not internal, and that it is possible for someone who uses a condom not to leave detectable DNA.

### 2. Forensic Psychologist

In addition, Dr. DR was called by trial defense counsel and testified as an expert in forensic psychology, clinical neuropsychology, memory and alcohol, and the effects of alcohol on memory. Dr. DR acknowledged alcohol can be, and often is, a factor in sexual assault, and that alcohol "can increase one's desire and motivation [for] sexual arousal." Dr. DR further testified that "alcohol reduces inhibitions. It makes people a bit more impulsive, more likely to act on urges that they might not normally." He elaborated that "when alcohol is involved, . . . voluntary sex is more likely to happen." According to Dr. DR, alcohol consumption increases the likelihood that someone would agree to something they would be less likely to agree to if they were sober.

According to Dr. DR, it is difficult to gauge a person's level of intoxication. He testified that people, even experts, can overestimate someone's degree of intoxication, sometimes because there may be other influences on their condition. Dr. DR made clear that even someone slurring their speech, stumbling, or losing balance due to alcohol could nevertheless appraise the nature of their behavior. According to him, such a person could be able to physically communicate a willingness to engage in any given behavior, to include sexual acts. Dr. DR explained that alcohol affects people differently. According to him, some people "could blow a .3[0] [BAC (blood alcohol content)]," as an example of a high BAC, "and keep walking and seem not impaired[.]"

In particular, Dr. DR testified about the theory that TC likely experienced blackout when the events allegedly occurred. According to him, "the actual

definition of blackout is just . . . the inability to form new memories." He explained that "[o]ther cognitive abilities and motor abilities are independent of the ability to form new memories." He further stated, "[Y]our motor function, your ability to have a conversation — all of that can still be intact." Dr. DR testified that in his professional opinion, "[Y]ou can't look at a person and know if they're in a blackout." He stated everybody is different and "[y]ou can't know . . . what number of drinks someone needs before they have a blackout." He stated that a person can form intent while in a blackout and "engage in all kinds of normal behaviors. . . . You can have conversations. You can drive a car. You can order pizza. You can take your clothes off. You can have sex."

Dr. DR further testified "generally[,] what predicts a blackout is the rate of drinking. . . . [T]he best indicator is how fast you're drinking[,]" not necessarily the number of drinks consumed. According to him, many variables affect whether someone has a blackout. He testified that it depends on many factors: "gender has an effect, your body weight, the muscle versus fat content, how much food is in your stomach . . . the genetic history."

When asked about incapacitation, Dr. DR referred to "passing out" as an example of incapacitation and means complete loss of consciousness. According to him, "It's . . . analogous to going to sleep, essentially. So when you're passed out, you cannot have a conversation." He further explained that incapacitation is different from impairment. Impairment, he explained, can start at one drink and means normal functional performance is affected. He testified that to some extent, impairment is subjective. According to him, "Incapacitation is when someone is unconscious or completely unable to communicate or control their body." Dr. DR testified that it is not necessarily true that if someone appears to be stumbling or otherwise impaired after consuming alcohol that they are incapable of consensual behavior, to include sex.[8]

### 3. Anatomical and Forensic Pathologist

Another witness, Dr. DF, was called by trial defense counsel and testified as an expert in anatomical and forensic pathology. He reviewed the evidence of injuries to TC in this case, specifically the evidence gathered and the report created by Dr. SO at the emergency room in Ireland. Dr. DF explained that forensic pathologists are trained to interpret the biomechanics of injury—meaning what caused the injury to occur. According to Dr. DF, Dr. SO

---

[8] The military judge gave the members legal instructions on the definition of "Incapable of Consenting" and informed them that when deliberating on the charged specifications they would be bound by the legal definition in the instructions he would provide.

documented abrasions on both knees, elbows, the upper humerus on one side, and the fourth toe on one side. Dr. DF noted some red areas down the back of the neck and the cervical column. He also identified tenderness of the small of the back, the lumbar region up into the mid-thoracic area, and the hips. Dr. DF confirmed Dr. SO specifically reported there were no injuries to the genitalia and did not comment on the anus. According to Dr. DF, photos in the report showed a small abrasion at the base of TC's right thumb and bruising on her hips.

Dr. DF could not explain why TC did not report any pain until she arrived in Ireland. He explained "[p]ain in most circumstances . . . tends to come on sooner rather than later. It's kind of a protective mechanism to prevent you from doing the same thing again . . . ." He also could not explain TC's report of anal and vaginal bleeding when she used the toilet upon arrival in Ireland. In his opinion, the presence of male DNA on the outside of the anus "doesn't prove [if penetration occurred] one way or the other." According to Dr. DF, fluids from the vaginal cavity can flow down to the anal area, especially when someone is lying on their back.

Dr. DF further testified there are multiple types of abrasions. According to him, the abrasions on TC were "punctate abrasions, and that means penetrating or pinpoint." He also observed documentation of linear abrasions, meaning where an object is scraped over the skin causing lines. Dr. DF could not conclude specifically if the abrasions to TC were made by the surface of a tennis court, but found they were caused by some rough or abrasive surface such as a sidewalk or asphalt.

In Dr. DF's testimony, he observed the punctate abrasions shown in the photos of TC's knees and elbows looked very similar. He did not see any "blurring and/or protective implications or protective nature of clothing in between them." He concluded there was nothing between the knees and the surface or the elbows and the surface that caused the punctate wounds. Specifically, Dr. DF informed the members they were "just typical abrasions, interaction of the skin on an abrasive surface." According to Dr. DF, there was some degree of linear extension in the knee area that would imply a little bit of movement or rubbing.

Dr. DF testified the abrasions to the knees, elbows, and toe were consistent with someone being on their hands and knees. He found the redness on the back of TC's neck and down the center of the spinal area could have been caused by knuckles or other pressure by a mechanism without an abrasive surface. He testified such a non-abrasive mechanism would not take off the surface layer of the skin, but might transmit energy to the deeper structures and

cause bruising. Dr. DF noted no recorded injuries around the side or front of the neck. According to him, muscle pain could be caused by any type of activity that stresses the muscles, not sex exclusively. Dr. DF considered it unlikely TC's abrasions were defensive in nature. Dr. DF concluded TC must have gotten the knee and elbow abrasions by "[h]olding up, basically balancing on her knees [and] . . . elbows" on a rough surface of some sort.

### 4. OSI Forensic Testimony

Air Force Office of Special Investigations (OSI) special agent (SA) JS testified he used keycard entries, closed-circuit television (CCTV) footage, and witness testimony to make certain timeline determinations. In particular, he stated the timestamp on CCTV footage from lodging at NASSIG showed Appellant returned to his room at 2149 hours. Furthermore, SA JS confirmed, according to the keycard logs, Appellant never left his room after he entered at 2149 hours until he checked out the next morning.

SA JS explained the cameras for the part of the building near TC's room were inoperable. SA JS confirmed, however, that logs showed TC keyed into her room at 1634 hours, 0218 hours, 0234 hours, and 0353 hours.

SA JS further testified about watching a video of Appellant's interview with OSI agents. According to SA JS, Appellant did not say he had sex with TC, but stated he drank at the recreational/shelter area at lodging, went to the pub and drank more, and then went back to lodging where he vomited somewhere along the way. SA JS testified Appellant also stated he did not recall bringing TC directly back to her room, but remembered hearing a voice behind him when vomiting on the way back to lodging from the pub and he believed it was TC's. SA JS also testified he reviewed multiple statements from witnesses who indicated TC denied having been sexually assaulted.

## II. DISCUSSION

Appellant argues that his conviction for sexual assault is factually insufficient.[9] We agree and conclude that the evidence in this case is insufficient to find each element of the offense beyond a reasonable doubt.

---

[9] Specifically, Appellant argues (1) TC's alleged incapacity does not make sense given the recorded amount of drinking, thus Appellant would not have reason to believe she was incapacitated; (2) TC's demeanor did not suggest she was incapacitated, and expert testimony supports Appellant's mistake defense; and (3) speculation about what

16

**A. Law**

We review issues of factual sufficiency de novo. Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 271–72 (C.M.A. 1993) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399).

A military member commits the offense of sexual assault when he or she commits a sexual act on another person while the other person is incapable of consenting to the sexual act due to impairment by an intoxicant and the other person's condition is known or reasonably should be known by the accused. Article 120, UCMJ, 10 U.S.C. § 920. A "sexual act" includes penetration, "however slight," of the penis into the vulva or anus or mouth. Article 120(g)(1)(A), UCMJ. "Incapable of consenting" means the person is "(A) incapable of appraising the nature of the conduct at issue; or (B) physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act at issue." *Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 60.a.(g)(8)(A)–(B).[10]

---

might have happened cannot fill the evidentiary void. While we agree that aspects of Appellant's three stated reasons to question factual sufficiency have merit, we decline to address those issues independently or incorporate them into our analysis.

[10] The offense of sexual assault for which Appellant is convicted occurred in July 2018, making definitions applicable to the 2016 *MCM*. However, by the time of trial in 2022, the 2019 *MCM* was in effect, thus establishing this definition of "incapable of consenting." *See also United States v. Pease*, 75 M.J. 180, 185 (C.A.A.F. 2016) (holding that the Court of Criminal Appeals correctly defined "'incapable of consenting' as 'lack[ing] the cognitive ability to appreciate the sexual conduct in question or [lacking] the physical or mental ability to make and to communicate a decision about whether they agreed

## B. Analysis

We find the evidence presented at trial was factually insufficient to support Appellant's conviction for sexual assault. As charged, the offense of sexual assault, in violation of Article 120, UCMJ, required the Government to prove beyond a reasonable doubt: (1) between on or about 1 July 2018 and on or about 2 July 2018, Appellant committed a sexual act upon TC; (2) TC was incapable of consenting due to impairment by alcohol; and (3) Appellant knew or reasonably should have known of TC's condition. *See Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 45.b.(3)(A). Our basis for finding factual insufficiency is the lack of evidence to establish elements (2) and (3): TC was incapable of consenting or Appellant knew or should have known of such condition.

### 1. Lack of Sufficient Evidence

We find the evidence was only factually sufficient to support the first element of the offense, *i.e.*, that Appellant committed a sexual act on TC within the timeframe alleged. After all, DNA evidence supports the contention that Appellant and TC had engaged in vaginal sex at some point that night. There are no eyewitness accounts, however, to provide any further detail about the specifics of this sexual act, including the specific location of where it occurred. It seems doubtful the sexual encounter between TC and Appellant happened at the tennis courts given key card entries indicate TC entered her room twice after midnight and before she fell asleep on the tennis courts. Moreover, there is some merit to Appellant's contention that he arrived back at lodging with TC given the time he entered his room after leaving the pub. The record is devoid of facts to indicate what TC did after 2149 hours—the time Appellant entered his room—and 0218 hours and 0234 hours, the times TC accessed her room before police found her wandering around the tennis courts shoeless and upset.

TC testified she had no memory of her conduct beginning at some point when she was in the pub and continuing until she awoke on the tennis courts. Multiple witnesses testified Appellant was asked the next morning about escorting TC back to lodging and he provided varying, but relatively consistent responses that he took her back to the lodging building, even if he did not take her directly to her room. Appellant did not say anything about having sex with TC, however.

---

to the conduct.'" (alterations in original) (citation omitted)). The members in Appellant's case were instructed consistent with *Pease* and the updated statute.

As for the second element, there is a lack of factually sufficient evidence to support a finding that TC was incapable of consenting due to impairment by alcohol. In this case, it is especially challenging to determine how much alcohol TC drank on the night in question because of the conflicting accounts by witnesses, including TC's own testimony. There were inconsistencies and lack of memory regarding details among all witnesses' accounts which according to Dr. DR could be attributed to a myriad of reasons. In this case the inconsistencies and lack of memory could be due to the long deployment, stress of redeployment, lack of sleep, and alcohol consumption.

It is clear TC had some amount of alcohol that evening. She testified she consumed one full and one-quarter Long Island Iced Tea drinks while at the pub. While she agrees she may have had additional drinks, she does not remember drinking anything other than the teas. Other testimonies ranged from SSgt BO's observation that when TC arrived she did not seem "overly intoxicated by any means" to testimony that later in the evening her speech was a bit slurred; and MSgt JD's observation that she swayed a bit and leaned on the bar as one does when drinking and that by the end of the evening she was "one of the more intoxicated people in that group."

SSgt BO remembered seeing two shots and a beer in front of TC and assumed she drank them. On the other hand, TSgt GC does not recall anyone having shots that night. From all accounts, TC was likely at the pub for approximately three hours. It is reasonable to conclude TC drank enough to be impaired by alcohol to some extent; however, no witness testified to seeing her falling down drunk, unable to carry on a conversation, getting sick, falling asleep, or doing anything else that would support a belief she was incapable of appraising the nature of her conduct or in any way physically incapable of engaging in volitional behavior.

TC, for her part, could not recall when her purse was returned to her after she returned to lodging, thereby indicating she was still having some trouble forming memories even at that point in time. As Dr. DR testified, her inability to form memories could be due to many non-exclusive factors to include: how fast she drank alcohol before entering a blackout phase. None of the witnesses who spoke to her in the morning after the alleged assault testified that they believed she was impaired to the point of not being able to act on her own volition or answer questions in a cohesive manner. Furthermore, according to Dr. DR's expert testimony, the witnesses would have had no way to know whether she was making memories of the events as they unfolded.

Dr. DF further testified he did not believe TC's abrasions were defensive in nature. He concluded TC received the knee and elbow abrasions by "holding

up, basically balancing on her knees [and] on elbows . . . on a rough surface of some sort." This evidence vitiates a theory of incapability to engage in volitional behavior—to include having sex. Based on this trial record, we cannot find TC was incapable of consenting due to impairment by alcohol.

The timeline indicates that TC and Appellant likely had sex at some point after leaving the pub, which is estimated to be between 2000 and 2100 hours, and before Appellant returned to his room for the remainder of the night at approximately 2149 hours. Just before TC left the pub, witnesses saw her capable of walking, talking, making music recommendations, and interacting with others. While she may not remember what happened after she left the pub, it is likely she was capable of continuing to engage in volitional behavior while in the presence of Appellant.

The Prosecution presented a theory at trial that Appellant was guilty because he did not mention sex with TC when questioned by OSI, his statements of where he found TC's cellphone were inconsistent, and he did not provide a complete account of where he split up from TC after they left the pub. We find these theories unpersuasive as Appellant's memories also may have been affected that night due to his own level of intoxication. Based on our review of the record, we find there is equally insufficient evidence to prove Appellant knew or should have known TC was incapable of consenting to sex due to impairment by alcohol, as there is to find such an impaired condition existed in the first place.

As a general matter, the evidence presented at trial is inconclusive on many important details related to Appellant's culpability. Notably, it is impossible to know beyond a reasonable doubt exactly what happened on their way back to lodging. If you believe Appellant, he in fact got back to lodging with TC and on the way he got sick. After arriving at lodging, he and TC sat at the picnic area for a while. According to the timestamp on CCTV footage, Appellant entered his room alone at 2149 hours and did not leave again until the next morning when he checked out of lodging. This time is consistent with Appellant's statements as to what occurred after he and TC left the pub. According to keycard logs, TC, unlike Appellant, did not return to her room until the early morning hours on 2 July 2018. The logs also showed she entered her room multiple times during the course of the night, meaning she also left her room multiple times. With no CCTV footage to capture her area of lodging, it is impossible to know if anyone else accompanied her when she entered and left her room or in what physical state she would have appeared to have been.

### 2. Motive to Fabricate

In addition to our conclusion that there is insufficient evidence to conclude Appellant sexually assaulted TC, we also question TC's motives in alleging assault in the first instance. In this case, TC found herself in a bad way after a night of drinking with her unit mates. When she awoke on the tennis courts in the early morning hours of 2 July 2018, she was no doubt out of sorts due to being alone, shoeless, without her purse or cellphone, and seemingly still under the influence of alcohol. Even in her state, when asked by multiple people, she denied having been assaulted.

A series of events then unfolded in the hours thereafter that raise legitimate questions about TC's truthfulness, including possible motives to fabricate a story that she was assaulted. When security forces found TC shoeless and potentially still intoxicated shortly after she awoke by the tennis courts, the officers' handling of the matter could have created problems for her. In TC's testimony, she stated she did not know how the police "found out where [she] was staying … but they did." This comment might suggest TC did not want the officers to know where she was staying because she did not want them to associate her with her unit and call her supervisor. While the officers were not interested in creating a disciplinary situation for her, she would not have been aware of that at the time.

TC also made clear in her testimony that when she returned to lodging with the officers, MSgt BT, her troop commander, was waiting for her, and she felt horribly embarrassed, "humiliated[,]" and "worried about . . . how it looked." She must have been well-aware at that time that MSgt BT could have reported her higher up the chain of command or issued disciplinary paperwork given the situation. While this did not happen, she soon became aware that her husband was also concerned enough about her situation to call her co-worker, SSgt TS, who then became another person aware of her behavior that night.

TC's possible motives to fabricate do not end there. To make matters worse, TC then failed to wake up in time to make the 0700 hours show time to meet the bus. TC's troop commander, upon realizing TC was not present, sent SSgt TS to her room. While SSgt TS was assisting TC to pack and get to the bus, TC went to the bathroom to change into her uniform and discovered scrapes and bruises on her body—marks she knew she would likely have had to explain to her husband once she arrived home.

Missing this movement for the bus departure was yet more conduct for which she could have received disciplinary action. All members of the unit were waiting on TC and she was late. Her colleague, SSgt KW, who was a good friend of her family and knew her husband and children, questioned her about what

happened to her the night before. TC testified she told him "everything [she] knew up to that point" and recalled he became "visibly angry." She likely attributed his anger with her as disapproval of her conduct as she had just explained to him.

Simply put, TC was shaken by her own behavior. She knew she had been out with her male colleagues who would have observed her behavior, may or may not have remembered expressing in the presence of her colleagues that she was attracted to TSgt GC, and drank to the point of not remembering the events that led to her waking up on the tennis courts. Still, her testimony suggests she had an inkling that whatever interactions she had with her colleagues were volitional and denied any assault multiple times to multiple people, even without having any memory of the events of the previous night after leaving the pub.

It is also notable that TC reported to Dr. SO in Ireland that she had no memory whatsoever of the events that unfolded after she left the pub, but, nevertheless, commented spontaneously, "if this happened … [she] assumed it was [ ] someone from the Naval Base that [they] were at in Italy, while [she] was laying on that tennis court." She specifically told the doctor that it was not TSgt GC who assaulted her, which could have been because she was attracted to him and had an impulse to deny any potential consensual sexual encounter due to her concern about cheating on her husband and lack of memory. She never mentioned Appellant. All these statements are indications of motive to fabricate an assault.

### 3. Genesis of Sexual Assault Allegation

When TC walked back to the tennis courts with Ms. KB to look for her cellphone, TC said she smelled like sex. According to Ms. KB, TC seemed mainly concerned about the possibility she cheated on her husband. When TC told Ms. KB that she could not remember what had happened earlier in the night, Ms. KB advised TC that if she could not "remember having sex then there was no consent." This was not, however, an accurate description of how memory, volitional behavior, nor the law works, even when alcohol is involved. Later, when TC hastily checked out of lodging to get on the bus, Ms. KB reenforced the idea that TC might have been sexually assaulted by slipping a SAPR pamphlet into TC's pocket and telling her "to call them if she needed anybody."

Seemingly, this idea by Ms. KB that TC may have been sexually assaulted set the wheels in motion for TC's follow-on conduct. Ms. KB's assertions undoubtedly lingered on TC's mind as she sobered up on the flight to Ireland and

the reality of her potential conduct began to sink in. By the time TC arrived in Ireland, she had a newly formed belief that she may have been raped.

Given there is insufficient evidence to prove the element alleging TC was incapable of consenting to sex with Appellant due to alcohol consumption, there is equally insufficient evidence to prove Appellant knew or should have known of this condition, since we have found insufficient evidence the condition existed in the first place.

In conducting our appellate review for factual sufficiency, we took a fresh, impartial look at the evidence, applying neither a presumption of innocence nor a presumption of guilt and made our own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt. After weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are not convinced of Appellant's guilt beyond a reasonable doubt. *See United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (citation omitted).

### III. CONCLUSION

The findings of guilty and the sentence are **SET ASIDE**. The charge and its specification are **DISMISSED WITH PREJUDICE**. All rights, privileges, and property, of which Appellant has been deprived by virtue of the findings and sentence set aside by this decision, are ordered restored. *See* Articles 58b(c) and 75(a), UCMJ, 10 U.S.C. §§ 858b(c), 875(a).

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court